RUDESINDA MONAGAS DE BRAVO, Plaintiff and Appellee, *v.* R. SANCHO BONET, TREASURER OF PUERTO RICO, Defendant and Appellant.

No. 8227. Argued November 6, 1940.—Decided December 6, 1940.

*George A. Malcolm, Attorney General,* and *M. Rodríguez Ramos, Assistant Attorney General,* for appellant. *J. J. Ortiz Alibrán* for appellee.

Mr. Justice De Jesús delivered the opinion of the court.

Doña Estela Bianchi, widow of Monagas, died in Mayagüez, on December 14, 1934, leaving as her sole and universal heir the plaintiff herein. For the purpose of the inheritance tax, the plaintiff filed in the Treasury Department a notice containing an inventory of the property belonging to the estate, which included 175 shares of stock of the Mayagüez Sugar Co. The plaintiff estimated the value of said shares at $70,000, or at the rate of $400 each, although the par value thereof was $1,000 per share. The Treasurer accepted the valuation of the remaining property pertaining to the estate, but as to the shares of stock, he estimated their value at the rate of $1,480 each, thus increasing that item from $70,000 to $259,000. Thereupon the plaintiff appealed to the Board of Review and Equalization, which, after the proper hearing, reduced the appraisal of the Treasurer as regards the shares of stock from $259,000 to $175,000, and estimated the value of each share at $1,000. Feeling aggrieved by that decision, the plaintiff paid the tax under protest and brought this action in the lower court, praying

for the return of the whole of the taxes paid by her, to wit: $12,882.96 and surcharges thereon amounting to $1,803.61, or a total of $14,686.57, which she alleges were illegally collected, together with interest on said sum at the legal rate from the time of the filing of the complaint, and costs, disbursements, and attorney's fees, as, according to her, Act No. 99 of August 29, 1925, entitled "An Act to Modify and Extend the Inheritance Tax, and for other purposes" (Session Laws of 1925, p. 790) was unconstitutional, and praying further that in case the constitutionality of the act should be upheld, the defendant be adjudged to return to her $7,182, which is the difference in the amount of the tax, as computed on the basis of the valuation of the shares made by the Board of Review and Equalization and that of the estimate value fixed by the plaintiff at the rate of $400 each share.

After a demurrer for insufficiency of the complaint had been overruled, the defendant answered. Upon the issue thus made and after hearing the evidence, the court, on July 14, 1939, rendered the judgment appealed from whereby the constitutionality of the act involved was upheld. The court estimated the total value of the shares to be $75,463.50, or at the rate of $431.22 each, and directed that a new liquidation be made by the Treasurer of Puerto Rico on the basis of the value of the shares as fixed by the court, and thereafter to return to the plaintiff the amount collected in excess of the one actually due, together with interest thereon from July 1, 1936, the date of the filing of the complaint, without costs.

The defendant took the present appeal, and the plaintiff moved to dismiss the same as frivolous; but as at the time said motion was heard by this court, on the 6th of last month, both parties had already filed their respective briefs in connection with the appeal proper, they stipulated with the approval of the court, that in case the dismissal sought did

not lie, the appeal should be decided on the merits without the necessity of a new hearing.

■ An appeal is frivolous where its insufficiency is so manifest that no mental exertion is required to discover it. An appeal like the present, in which counsel for the appellee has deemed it necessary to file a 28-page brief in order to answer the arguments of the appellant, can not by any means be considered as frivolous.

■ In the assignment of errors mention is first made of the overruling of the demurrer filed by the defendant. Although this error has not been discussed in the brief of the appellant, since a demurrer for lack of a cause of action is involved, we have examined the complaint and in our judgment the same is sufficient. Putting aside the demurrer as well as the constitutional question raised by the plaintiff —for she took no appeal from the judgment which overruled the same—the only question to be decided in this appeal is whether, for the purpose of the payment of the inheritance tax, shares of stock of a close corporation, which have no known market value, must be assessed in accordance with their book value, as claimed by the defendant-appellant, or whether, as on the contrary maintained by the plaintiff-appellee, the value of the corporate property should be resorted to for the purpose of determining the value of the shares, where, as in the present case, it is alleged that the book value is inflated and does not represent the true and just value of such shares.

In Puerto Rico there is no law establishing the rule to be followed in cases like the present, and the question is a novel one in this court.

In referring to this question, the Board of Tax Appeals has said that there is no established controlling method for determining the value of the stock of a close corporation, but rather that the problem must be solved by the exercise of sound judgment through the application of a method which

is fair and proper under the circumstances of each particular case. *Huntington* v. *Commissioner of Internal Revenue*, (1937) 36 B. T. A. (F.) 698. The adjudicated cases, however, give preference, in the first place, to the market value of the shares of stock; and in case this market value is unknown or the book value does not entirely reflect the truth, then the value of the stock may be determined by appraising the property of the corporation which it repre-- sents, together with the good will, if any, then dividing the total value of the assets less the amount of the liabilities and of the preferred stock, if any, by the number of common shares, and the quotient will be the net value of each share. See the monographs in 24 A.L.R. 1041, 57 A.L.R. 1155, 83 A.L.R. 940, and 117 A.L.R. 149. See also *In re Lemke's Will* and *State* v. *Lemke*, (1931) (Wis.) 238 N.W. 806. In the instant case the evidence showed that the shares of stock had no known market value, as no sale thereof had ever. been made, and although according to the evidence for the plaintiff the 175 shares in question were offered to three different persons interested in the purchase of securities and one of them offered $400 per share—which offer was not accepted, since it was not the purpose of the plaintiff to sell her shares, but only to determine their market value—we can not accept that simple transaction as a basis for determining the value of the stock. From the evidence it also appeared that the book value of said shares of stock was considerably inflated. Regarding the book value, the trial court in its opinion said:

"There is no doubt that the evidence introduced by the plaintiffs is preponderantly in favor of the establishment of her allegations that the book value had been erroneously determined and that in this case a new assessment was required in order to make the proper readjustment. The evidence clearly shows that there is involved a sugar mill which has been in use for 30 years, having an old machinery which is obsolete for other centrals. The testimony of Don Oscar F. Bravo sets forth the history of the central; he

explained that the prospects of the sugar industry in 1935, due to the passage of the Costigan-Jones Act, was not good; this was also shown by the very evidence of the defendant from which it appears that the true situation during the year 1935 was represented by a loss on the balance sheet amounting to $70,000. The engineer, Mr. Castro, testified so fully regarding the value of the property that his sole testimony would be sufficient for this court to hold that the value of the factory as set forth in the books was exaggerated. The court can not disregard all that testimony, which proves the allegations of the complaint. If the defendant had presented to us the testimony of experts to controvert the testimony introduced by the plaintiff, the court would be in a position to judge as to which of the valuations was the correct one. The defendant very often relies, as he states in his brief in this case, on the fact that it is an elementary principle that public officers satisfactorily discharge the duties of their office and that their actions are correct and such being the case the defendant places the burden of proof on .the person who attacks such correctness. But it has already been held on repeated occasions, and quite recently in *South P. R. Sugar Co. v. Treasurer,* 54 P.R.R. 67, that the presumption in favor of the correctness of an administrative assessment is not irrebuttable. In the present case, we think, that presumption has been fully rebutted.'' (Record, pp. 38, 39.) .

In an article by Benjamin M. Robinson, entitled ''Dissenting Shareholders, Their Right to Dividends and the Valuation of Their Shares,'' published in (1932) 32 Columbia Law Review, p. 60, in treating of the scant probative value of the book value of shares of stock, the following is said:

''Kentucky and New Mexico prescribe the book value of the shares as the minimum value. This is unsound. As stated by Hand, J., 'The suggestion that the book value of the shares is any measure of their actual value is clearly fallacious. . . .' The book value of corporate shares admittedly bears no relation to their worth in any proper sense. They are often inflated or deflated to suit particular purposes irrespective of earning power, market prices, scrap value, etc. If the book values are stated at cost less depreciation they may no longer be worth the resulting figure because of the fact that their economic usefulness has passed. Reproduction values are no more accurate for the same reasons.'' (Pp. 74–75.)

We shall therefore resort to the method which, under the circumstances, appears as the most acceptable, viz., that of assessing the physical property represented by the shares of stock.

From the evidence of the plaintiff-appellee it appears that the corporation involved is engaged in the manufacture of cane sugar and that the only land which it holds is a parcel of 18 acres *(cuerdas),* in which the factory and other accessory buildings are located. That this central was established in 1908, with a certain machinery which had been brought from England two years before and which it had not been possible to remove from the wharf because the importer was not in a position to pay the corresponding customs duties. That at the time of the death of plaintiff's ancestor which occurred on December 14, 1934, 85 per cent of the machinery was the same one with which the central had been originally established in 1908, that is, which had been used for about 27 years, without there having been introduced in said machinery any of the modern improvements with which the other centrals are equipped and which serve to increase their yield considerably.

Pedro B. Castro, a mechanical engineer graduated in 1911, who served in that capacity in this central in 1923 or 1924, and who has had experience as such in the following centrals: Eureka, Boca Chica, Mayagüez Sugar Co., Juanita, and Fajardo, in Puerto Rico, and Pilar and Estrella, in the Republic of Cuba, testified for the plaintiff. This witness stated that in 1935 he was requested by Don Oscar Bravo, President of the Mayagüez Sugar Co., to make a valuation of all the properties of the central, and that, as he was then living in San Juan, he had to devote ten or twelve week-ends in making trips to Mayagüez in order to take all the necessary data on the premises and then return to his residence in order to make the proper computations. Regarding the way in which he had made the valuation, the witness stated that he had examined each of the engines,

694

pumps, appliances, etc., by taking the exact measurement of each of them, ascertaining their foundation, estimating the freight charges, cost of installation, taking into account the year in which the machinery was erected or purchased in order to estimate the life of each engine and thus be enabled to compute its depreciation, obsolescence, etc., and after a detailed study of each dependency of the central, which he divided into its various departments, he reached the conclusion that the value of the central of said corporation, including the factory, machinery, lands, cattle, house, etc., amounted to $189,436.78. If to that sum we add the balance of the remaining assets of the corporation amounting to $247,025, we then have the gross assets—exclusive of the good will, for it was not proved that there was any and the trial court so stated—which total the sum of $436,461.78. Deducting the liabilities, which both parties agree amount to $328,657.42 from the assets, we then have that the net assets of·the corporation amount to $107,804.36, which sum divided by the 250 shares issued, give us a quotient of $431.22, which is the value of each share. As the number of shares inherited by the plaintiff is 175, the total value of the same is $75,463.50, which was the value fixed by the lower court.

As, in our judgment, the evidence of the plaintiff satisfactorily overcame that· of the defendant, which consisted only in the book value of the shares, and as we fail to find that the lower court committed manifest error in the weighing of the evidence, the appeal must be overruled, and the judgment appealed from affirmed.